ERNEST G. BAHM ET AL., APPELLEES, V. RALPH RAIKES, APPELLANT.

70 N. W. 2d 507

Filed June 3, 1955. No. 33659.

*Bryant & Christensen, Kennedy, Holland, DeLacy & Svoboda,* and *Gross, Welch, Vinardi & Kauffman,* for appellant.

*Myrl D. Edstrom, John J. Edstrom, Claude D. Lutton, Jr.,* and *Ralph D. Nelson,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

The land of appellant concerned in this litigation is parts of Sections 17 and 18, Township 13 North, Range 9 East, of the 6th P. M., Saunders County, Nebraska. He purchased the southeast quarter of Section 18, the northwest quarter of the southwest quarter, and the part of the south half of the northwest quarter of Section 17 south and west of the railroad right-of-way, referred to in the record as the Heldt land in 1936. He bought the northeast quarter of Section 18 except a small part thereof north and east of the railroad right-of-way and the part of the north half of the northwest quarter of Section 17 south and west of the railroad right-of-way, known as the DeFoil land, the northwest quarter and the northeast quarter of the southwest quarter of Section 18, described as the Grebenicek land, and the southwest quarter of the southwest quarter and all of the east half of the southwest quarter of Section 17 south of the railroad right-of-way, spoken of as the Gilkeson or Owen land. The title of the land was conveyed to appellant by deeds dated in the period of March 18, 1941, through July 14, 1943.

Mosquito Creek, which drained an area of about 14 square miles to the southwest of the land of appellant, at the time he acquired his land entered it at the southwest corner of the northwest quarter of Section 18 and proceeded along the west section line until it joined

Wahoo Creek about 650 feet south and approximately 100 feet east of the northwest corner of the section. The creek had formerly entered Section 18 a short distance east of the southwest corner thereof, meandered in a northwesterly direction through land to the west of Section 18, and joined Wahoo Creek west and slightly south of the confluence of the creeks at the time appellant acquired the land. A ditch had been excavated about the year 1928 along the west line of Section 18 and it became and has since been the channel of Mosquito Creek in that location. A small dike was erected on the east bank of the channel.

Wahoo Creek, a constantly running stream, the drainage area of which is about 500 square miles to the west and northwest, then entered the land of appellant about 650 feet south of the northwest corner of Section 18, proceeded generally east but somewhat southward to near the center of the northeast quarter of Section 18 where it made a large hairpin curve with the apex thereof to the northeast. Its course from there was irregular and meandering to the south into and across the northeasterly part of the southeast quarter of Section 18, and into and across the northwest quarter of the southwest quarter of Section 17 and thence southeasterly where it crossed the south line of Section 17 a short distance east of the southwest corner of the southeast quarter of the southwest quarter of the section.

Silver Creek, a running stream, with a drainage area of about 83 square miles to the northwest of the land of appellant, intersected the north line of Section 18 about 500 feet east of the northwest corner of the northeast quarter of the section and proceeded with frequent and great irregularity to the southeast through the land of appellant between Wahoo Creek and the railroad right-of-way to the north thereof until it reached and emptied into Wahoo Creek near the northeast corner of the southwest quarter of the southwest quarter of Section 17.

Mosquito Creek in its natural condition frequently overflowed. The floodwater therefrom flowed across Section 18 toward the southeast. The slope of the land from Mosquito Creek was south and east. There were low areas on the section toward the south and east part of it. These were exhibited by a drawing of the land made by an engineer after a survey as sloughs. The area of the larger of these was given as about 50 acres. The size of the smaller was not established. There was a ditch through about the center of the large slough from the northwest to the southeast. The smaller one was connected by a drain with the ditch. The water from the ditch flowed upon and over a part of the southwest quarter of Section 17 and across the road about 550 feet west of the Wahoo Creek bridge on the highway south of the section. There was a concrete spillway about 400 feet in length constructed about the year 1928 across the east and west highway along the south of Sections 17 and 18 at the place where the floodwater came to and crossed the highway as above stated for the purpose of accommodating and accelerating the flow of the water from the road and the land of appellant and others. The floodwater of Wahoo Creek as early as 1918 and thereafter passed to the south and west of the creek over land now owned by appellant to the spillway above described and onto Section 20 south of Section 17. There were times when there was floodwater on the west and south of Wahoo Creek and there was none on the opposite side thereof. Appellant conceded that before he had made any changes in Mosquito Creek or Wahoo Creek he had on several occasions seen floodwater flow over the road south of Section 17 and west of the bridge over Wahoo Creek. These creeks at times of heavy rainfall or large run-off discharged large volumes of water. The area involved is quite low level land with a slightly declining elevation to the southeast from the creeks. The land has been subject to multiple floods. There is mention in the proof that in

one year there were nine floods of varying intensity, another year experienced four floods, and quite generally each year produced at least one flood.

Appellant was in possession of the Heldt land in 1937. The southeast quarter of Section 18 was the principal part of it. The water came out of Mosquito Creek that year and passed down over the Heldt farm. Appellant participated in repairing and restoring the dike on the east side of the creek. There were breaks in the dike at various times thereafter through 1943 and appellant restored it each time a defect appeared. In 1943 he had title to all the land he owns that is concerned in this case. He had by 1944 equipped himself with a Caterpillar tractor and a bulldozer, and later a dragline and dirt-moving equipment. In times of high water it would back up in Mosquito Creek from Wahoo Creek and delay or stop the flow of water in the former. The dike would become watersoaked and holes would develop therein. The water would seep at first and then the break would develop and enlarge, and the water would come out of the creek onto and over the land of appellant. The water in Wahoo Creek at high stages was 2 or 3 feet above the top of the Mosquito Creek dike. Appellant thought it was necessary to make the east dike along the creek wider so that there would be more capacity in the creek and more resistance in the dike. During 1944 he took dirt from inside the dike and made a new dike along the east of the creek that had three or four times the amount of material of the former one. It was wider, stronger, and a foot or more higher than the first one. This was effective for a time but in 1947 there was a severe flood and the dike gave way. In 1948 appellant procured a dragline, and repaired the dike, strengthened, widened, and elevated it along the west line of his land. There were holes made in the dike in 1950 and they were repaired. There was overflow of the creek in 1951 and work was done on it by appellant to accomplish his determination to

prevent water flowing upon and over his land from Mosquito Creek. When there was run-off in the drainage area of Wahoo Creek it raised and flowed upstream in Mosquito Creek. The work done on Mosquito Creek increased its capacity 10 or 15 times from what it was before appellant acquired his land. The water backed up in the creek from Wahoo Creek and it served as a reservoir until its capacity was exhausted or the dikes gave way. The appellant obstructed and changed the action and course of the floodwater of Mosquito Creek and of the flood plane thereof.

Appellant in 1944 entered upon the execution of a plan to straighten the channel of Wahoo Creek. He made an excavation for a new channel of the creek from about the northeast corner of the southwest quarter of the southwest quarter of Section 17 to the west side of the large hairpin curve in Wahoo Creek as it then existed a short distance northwest of the center of the northeast quarter of Section 18. This was completed in the late fall of that year. It was a pilot ditch so that it would widen and deepen by the action of the water flowing through it and this result has been accomplished. He put a dike on each side of the excavation. He continued to straighten the channel of the creek and to erect dikes on either side of the channel until substantially all of the curves, bends, and irregularities in the channel of the creek across his land were eliminated, and there were continuous dikes on either side of the creek. This work was pursued almost continuously from 1943 through 1952. When floodwater destroyed parts of the dikes they were restored. There was a break in the dike on the southwest side of the channel in 1952. The dike on the opposite side was unharmed. This break in the dike was about 40 feet long. The dike was 4 or 5 feet high and it was cut down to the level of the land. Appellant owned appropriate machinery for excavating, moving dirt, and constructing dikes. He had at times had an employee whose primary

assignment was to keep the equipment engaged doing needed work on the dikes and to repair, strengthen, widen, and elevate them. This was the execution of a plan of appellant to prevent floodwater coming on and flowing across his land. The fact that water from Wahoo Creek did get upon the land of appellant south and west of it is evidenced by his act of intentionally not erecting a dike along a part of the south and west side of the creek so that the water would overflow on a low part of his land, deposit silt, and build up the low land. This existed from 1945 to 1948. Appellant said the low places were silted up until they were nearly level with the surrounding land. There were flood conditions created along Wahoo Creek by heavy run-off north and northwest of the land of appellant when there was no local precipitation. The dikes referred to were intended to keep this water out of the creek and off the land of appellant. It is obvious that he obstructed the flood plane of Wahoo Creek and interfered with the action and course of water therein.

The proof is convincing that Silver Creek joined and flowed into Wahoo Creek at about the place indicated herein as early as 1893 and thereafter until about 1944. There was a change in its course about that year. Since then the water of Silver Creek at a place where it is nearest the railroad right-of-way on the land of appellant has flowed north into the ditch referred to in the record as the borrow pit on the south side of the railroad right-of-way, from there south and southeast to and through Ab's Lake, and southeast to and through the lands of appellees. The assertion of appellant that the change in the flow of Silver Creek was not caused by him but was the result of natural causes such as silting in of its confluence with Wahoo Creek is not convincing in view of the statement of appellant that he had no personal knowledge from 1937 to 1944 that Silver Creek joined Wahoo Creek, notwithstanding in 1936 he bought the land adjacent to the place where the

creeks came together and was in possession of and used the land from March 1, 1937. A witness who had lived in Memphis, which is a short distance from where the creeks converge, for 50 years and was during his residence there familiar with Wahoo Creek, Silver Creek, and the other locations important to this case gave information that Silver Creek emptied into Wahoo Creek near the house built on the Owen land by Mr. Owen in the vicinity of the Wahoo bridge on the road running east and west south of Memphis; that Silver Creek continued to empty into Wahoo Creek at that place from the time he came to Memphis until about the year 1945 when the water of the creek went north to the borrow pit or ditch along the south part of the railroad right-of-way and thence southeasterly; that the location where the water was diverted from the channel of Silver Creek was northwest a considerable distance from Memphis, which was near Ab's Lake; that the witness was there about a day after Silver Creek started to flow into the borrow pit; that he saw the drain that had been cut through blue grass sod from the creek to the railroad ditch; that it was about 5 feet wide, about 7 feet long, and quite shallow; that it was at the closest point of the creek to the railroad ditch; that something had to be done before the water would have gone from the creek into the ditch; that there was no evidence that any implement had been used but spade marks were visible where the drain had been made; and that in a later conversation between the witness and appellant he asked the witness "* * * if the railroad ever mentioned about Silver Creek being turned into the borrow pit." The history of Silver Creek flowing into Wahoo Creek at the same location for more than 50 years indicates there was no natural reason why Silver Creek should change its course and seek a new channel. The record does not show any demonstration of nature that had that result.

Appellant constructed a dike in 1947 from the old

channel of Silver Creek east and slightly south to Ab's Lake. This was southwest of the railroad in the northern part of the west half of the northeast quarter of the southwest quarter of Section 17. In 1950 he erected another dike along the south and west of Ab's Lake and westward to the east dike along Wahoo Creek. In 1951 and 1952 he made an excavation in the ditch to the southwest of the railroad and north of Silver Creek commencing about 700 feet southeast of the north line of the southwest quarter of the northwest quarter of Section 17 and continuing northwesterly to the north line of the land of appellant, and thence west until it intersected Silver Creek where it entered the land of appellant. The effect of this was to divert water that would have gone down Silver Creek before appellant had made transformations in the area and to conduct and force it toward the southeast north of the land of appellant through Ab's Lake and on to the east. This was a clear diversion of the water of Silver Creek from the course of its natural flow.

The flood plane of Mosquito Creek over the land of appellant according to the proof is the area from a line coming out of the creek about 900 feet south of Wahoo Creek and extending generally in a southerly and easterly direction to a line a distance of about 1,000 feet in a southerly and easterly direction. The opinion of the engineer was that the construction of a dike along the east bank of the creek has forced the floodwater thereof over into the Wahoo Creek area and has diverted it from the flood plane of Mosquito Creek. The remedy he said is to restore the condition as it was before the dike was erected.

There is a flood plane south of Wahoo Creek extending to the southwest corner of Section 17. The engineer testified that the dikes constructed by appellant have forced the floodwater which normally flowed on the south and west sides of Wahoo Creek over to the north and east of the creek; that the flood plane of the

creek has been effectively obstructed by the dikes; and that it is not possible to confine the floodwater of the creek in the channel the appellant has excavated. The opinion of the engineer was that the condition existing before changes were made in the channel and dikes were erected should be restored by removing the dikes on Wahoo Creek to at least the west line of Section 17.

The engineer stated that appellant had changed the course of Silver Creek so that instead of flowing into Wahoo Creek its water goes down along the railroad to Ab's Lake and on to the east; and that Silver Creek as it exists on the land of appellant carries about 15 or 20 percent of the floodwater of an extreme flood. He said the creek should be restored to its natural condition by requiring the construction of a channel to the place where it formerly emptied into Wahoo Creek and by effectively blocking the borrow pit ditch.

Willie Wischmann, one of the appellees, became the owner in 1939 of the northeast quarter and the north half of the southeast quarter of Section 21, Township 13, Range 9, in Saunders County. He moved onto it in 1940. There was a flood that year. He could see Wahoo Creek from his land looking southwesterly. There was floodwater on the south side of the creek. There was a railroad bridge near the southwest corner of his land. During the flood the water came through under the bridge and gradually and slowly moved upon his land from the southwest. In about 1944 there was a change in the flow of floodwater in that it came on the north side of the railroad grade and traveled straight east onto his land. There is now a continuously flowing stream thereon. It started with the flood of 1944. It leaves his place directly to the south. The water comes through Ab's Lake and easterly north of the railroad to his farm. The channel on his land is more than 30 feet wide. The water therein at the time of the trial was from 15 to 20 feet wide and from 1 to

2 feet deep. This stream remains within its banks except during highwater stages. He farmed and got a crop from his land each year before 1944. His land has been substantially made unfit for cultivation and production.

Ernest G. Bahm, an appellee, purchased the northwest quarter of the northwest quarter of Section 21, Township 13, Range 9, in Saunders County, in 1943. There was then no flowing stream thereon. There was water in a low place on the land. There was wheat growing on part of the land and the remainder was pasture and hay meadow. In May 1944 he saw water flowing under the bridge west of his land and willows floating in the water. He had not experienced this before. He went to Ab's Lake and saw water flowing into it from the northwest through a channel 10 to 12 feet wide and about 2 feet deep. It passed through Ab's Lake and east across his farm. Appellee at the time of trial had a constantly flowing stream through his land. He cannot raise grain or produce hay on his farm.

Appellant had seen his land flooded on several occasions before he did any work on the creeks or dikes. In 1943 he decided upon a plan to keep all floodwater off his land. He then committed himself to do what was required to stop the water that came from the north and northwest from going across any of his land. He said with evident satisfaction at the trial that he came pretty close to doing it in 1951 and that he even came closer in 1952. It is a fair inference that he pursued his predetermined plan relentlessly. If he considered what the result would be to other landowners he did not permit it to interfere with the complete execution of his plan. Hence this litigation.

The relief appellees sought herein was an injunction, preventive and mandatory, to prevent appellant from diverting the natural flow of Silver Creek, from diverting the flow of floodwater of Mosquito, Wahoo, and Silver

Creeks upon the land of appellees, and from maintaining the dikes erected along or near the streams by appellant; to compel appellant to remove the dikes; to restore Silver Creek as it was before appellant purchased his land affected by this case; and to restore the conditions on his land as they were then. Appellant contested the claims made by the appellees as a basis of the relief they sought by a denial thereof and of the right of appellees to any relief they asked. The trial court made specific and general findings in favor of appellees and adjudicated them substantially the relief they asked.

The acts of appellant disregarded the law concerning the subject of water flowing in defined watercourses. The doctrine is firmly established in this jurisdiction that water flowing in a well-defined watercourse may not be diverted and cast upon the lands of another landowner where it would not go according to natural drainage. In Andersen v. Town of Maple, 151 Neb. 103, 36 N. W. 2d 620, the court said: "Water flowing in a well-defined watercourse may not lawfully be diverted and cast upon the lands of adjoining landowners where it was not wont to run according to natural drainage." See, also, Purdy v. County of Madison, 156 Neb. 212, 55 N. W. 2d 617.

This case does not concern surface water as distinguished from floodwater. The rule in reference to floodwaters is applicable and controlling of the present case. It is said in Cooper v. Sanitary District No. 1, 146 Neb. 412, 19 N. W. 2d 619: "However, there is a clear distinction in the rules of law governing surface waters and floodwaters flowing as a part of a natural stream during flood season. We are committed to the rule that overflow waters flowing in the natural flood channel of a running stream are a part of the stream and are governed by the running water rule." In Mader v. Mettenbrink, 159 Neb. 118, 65 N. W. 2d 334, it is said: "The term 'surface water' includes such as is

carried off by surface drainage, that is, drainage independent of a watercourse. * * * The flood plane of a live stream is the adjacent lands overflowed in times of high water from which floodwaters return to the channel of the stream at lower points. This plane is regarded as a part of the channel and the water flowing within the channel or its flood plane is characterized as floodwater." In Ballmer v. Smith, 158 Neb. 495, 63 N. W. 2d 862, the court said: "The owners or proprietors of lands bordering upon either the normal or flood channels of a natural watercourse are entitled to have its water, whether within its banks or in its flood channel, run as it is wont to run according to natural drainage, and no one has the lawful right by diversions or obstructions to interfere with its accustomed flow to the damage of another."

It is beyond the area of argument in this state that a riparian owner may not dam, obstruct, or dike against floodwaters of a running stream to the injury of a lower landowner. Ballmer v. Smith, *supra;* Frese v. Michalec, 148 Neb. 567, 28 N. W. 2d 197.

This is an equity case. The evidence is in some respects irreconcilably conflicting. The trial court viewed the premises involved. The manner of the trial de novo of such an action in this court has too often been stated to permit its repetition. Likewise the consideration that may be given by this court on a trial de novo of an equity case of the fact that the trial court inspected the premises involved has often been expressed and was recently repeated. Keim v. Downing, 157 Neb. 481, 59 N. W. 2d 602; Shepardson v. Chicago, B. & Q. R. R. Co., *ante* p. 127, 69 N. W. 2d 376.

The judgment should be and it is affirmed.

AFFIRMED.